UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 07-60077-CIV-ZLOCH/ROSENBAUM

JORGE G. Z. CALIXTO, a
resident and citizen of Brazil,

                Plaintiff,

v.

WATSON BOWMAN ACME CORP.,
a Delaware corporation,

                Defendant.

_____/

## ORDER

      This matter is before the Court upon Plaintiff Jorge G. Z. Calixto's Motion to Compel Defendant Watson Bowman Acme Corp. To Remedy Its Spoliation of Documents [D.E. 86] ("Motion to Compel") and Plaintiff Jorge G. Z. Calixto's Motion for Issuance of Letters of Request [D.E. 89] ("Motion for Letters of Request"), pursuant to the Order of Referral [D.E. 116] entered by the Honorable William J. Zloch.  The Court has carefully reviewed Plaintiff's Motion, all filings in support thereof and in opposition thereto, and the record in this matter, and has heard argument on Plaintiff's Motions on September 16, 2009, and evidence at a hearing on November 12, 2009.  After thorough consideration, the Court now grants in part and denies in part Plaintiff's Motion to Compel and denies Plaintiff's Motion for Letters of Request.

## *I.  Background*

### A.  Factual Background

      According to the Complaint [D.E. 1] in this matter, until November 17, 2003, Plaintiff Jorge

G. Z. Calixto ("Calixto" or "Plaintiff") owned U.S. Patent No. 4,884,381 (the "Patent") and U.S. Trademark Reg. No. 1,477,685 (the "JEENE Trademark").  D.E. 1 at ¶¶ 2, 8.  Plaintiff has described the Patent as being "directed to a unique system for joining concrete slabs that may be used in the construction of parking garages or vehicular roadways.  The system provides for a seal which permits the slabs to expand and contract with environmental conditions, thereby preserving the integrity of the slabs and extending their useful life."  *Id.* at ¶ 9.  The JEENE Trademark protects the name "JEENE," which is used to identify certain materials and products used in implementing the Patent system.  *Id.*

Plaintiff alleges that on November 17, 2003, Calixto entered into an Asset Purchase Agreement ("Agreement") with Construction Research and Technology, GmbH ("CRT"), pursuant to which CRT purchased from Calixto certain rights related to the Patent and to the JEENE Trademark.  *Id.* at ¶ 10.  As Plaintiff explains the Agreement reached by the parties, CRT entered into it for the benefit of Degussa Construction Chemicals, Inc. ("DCCI"), and Defendant Watson Bowman Acme Corp. ("WABO"), who, through CRT, were to enjoy licensee and sub-licensee rights to the Patent and the JEENE Trademark.  D.E. 1 at ¶ 10.  At the negotiations that resulted in the Agreement, Markus Burri ("Burri"), then the chief executive officer of WABO, served as CRT's agent.  *See* D.E. 9 at 5.  Despite the purposes of the Agreement, Calixto and CRT were the only parties to it.  D.E. 9 at 5.  At the time that CRT and Calixto entered into the Agreement, CRT was a subsidiary of Degussa AG, which also was the ultimate parent of DCCI and WABO, which, itself, was a subsidiary of DCCI.  D.E. 9 at 6.

Plaintiff further contends that under the Agreement, CRT obtained the Patent and JEENE Trademark rights only within identified territories, and Calixto reserved those rights not specifically

transferred.  D.E. 1 at ¶ 11.  More specifically, Plaintiff reserved the right to make, use, and sell in, and import into the Asia/Pacific Territory products using the Patent process, and the right to use the JEENE Trademark for goods and services offered for sale within the Asia/Pacific Territory.  *Id.* at ¶ 12.

In addition, Section 13.6 of the Agreement reserved the signatories' rights to consent to transfer of assignment of rights acquired under the Agreement.  D.E. 1 at ¶ 13.  In this regard, the Agreement provided,

> [N]either party shall have the right to assign, in whole or in part, any of its rights or obligations under this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld. . . .  Any attempt by either party to assign any rights or obligations under this Agreement without the other party's prior written consent shall be null and void and of no effect.

*Id.*

The Agreement also included a section entitled "Agreement Not to Compete."  D.E. 1 at ¶ 12.  Under the Agreement Not to Compete, the parties agreed that CRT could separately enter into an exclusive license agreement with Calixto for the Asia/Pacific Territory.  *See* D.E. 1 at ¶ 12; *see also* D.E. 9-3 at ¶ 11.  If CRT did so, Calixto would allow CRT to employ the process described by the Patent within the Asia/Pacific Territory and to use the JEENE Trademark on products and in the course of providing services within the Asia/Pacific Territory.  *See* D.E. 1 at ¶ 12; *see also* D.E. 9-3 at ¶ 11.  Conversely, if CRT did not enter into an exclusive license agreement with Calixto for the Asia/Pacific Territory, the Agreement Not to Compete obligated CRT, its affiliates, and its successors not to import, manufacture, or sell within the Asia/Pacific Territory any product that relies on the Patent, and not to use the JEENE Trademark within the Asia/Pacific Territory.  *See* D.E. 1

at ¶ 12; *see also* D.E. 9-3 at ¶ 12; D.E. 59 at 3.

While the negotiations for the Agreement proceeded, CRT and Calixto simultaneously conducted negotiations for the exclusive license agreement for the Asia/Pacific Territory, as contemplated by the Agreement Not to Compete.  D.E. 1 at ¶ 14.  These negotiations, however, did not result in an agreement.  *Id.* at ¶ 15.  Nevertheless, Calixto asserts, WABO made, distributed, and sold products using the Patent and directly or indirectly employing the JEENE trademark or "colorable imitations thereof" within the Asia/Pacific Territory.  D.E. 1 at ¶ 16.

About three years after Calixto and CRT entered into the Agreement, in July, 2006, BASF AG purchased the construction chemicals division of Degussa AG.  D.E. 9 at 6.  Consequently, DCCI became BASF Construction Chemicals, LLC ("BASF CC").  *Id.*  BASF AG ultimately owns BASF CC.  *Id.*  Because WABO is a subsidiary of BASF CC, BASF AG now owns WABO as well. *Id.* at 7.  BASF AG similarly now owns CRT, although CRT retained all the rights to intellectual property it previously had acquired.  *Id.*  Nevertheless, Calixto argues that by virtue of BASF AG's acquisition of CRT, BASF AG obtained certain rights from CRT to the Patent and the JEENE Trademark without Calixto's prior written consent, in violation of the Agreement.  D.E. 1 at ¶¶ 19, 20.

In the meantime, after Calixto and CRT entered into the Agreement, Calixto contends, WABO and its affiliates, and subsequently, BASF AG through WABO and its affiliates, began selling a product in the Asia/Pacific Territory produced by Plaintiff's patented method but marketed under the name "ALADIN."   D.E. 89 at 2; D.E. 1 at ¶ 23.  According to Calixto, WABO "pass[ed] off] . . . ALADIN . . . as the same product sold under the JEENE Trademark."  D.E. 89 at 2.

Thus, Calixto asserts, "WABO intentionally and unjustifiably interfered with the Agreement

-4-

between Calixto and CRT, by causing CRT's breach and disregard of the 'Agreement Not to Compete,' and the right of the consent of assignment provided for in the Agreement." D.E. 1 at ¶ 28. As a result, Calixto claims to have suffered damages for the infringement of his trademark and the Patent, as well as for lost sales and alleged irreparable injury to his reputation and good will. *Id.* at ¶ 29. Accordingly, Calixto seeks damages and an injunction against WABO enjoining WABO from using the patented process and the JEENE Trademark in violation of the Agreement. *Id.* at 7.

**B. Procedural Background**

On March 18, 2005, Calixto, a Brazilian citizen, filed a complaint against WABO, CRT, and DCCI in the Florida Circuit Court for the Seventeenth Judicial Circuit in and for Broward County. *See* D.E. 9-3. The complaint alleged that the defendants to that action breached the Agreement in the Asia/Pacific Territory. *See id.* Upon consideration of DCCI and WABO's motion for judgment on the pleadings, the state court granted the motion, finding that neither DCCI nor WABO could have breached the Agreement because they were not parties to it. *See* D.E. 9-4. Separately, CRT moved to dismiss the case against it for lack of personal jurisdiction since, CRT claimed, neither CRT nor Calixto engaged in any business in Florida, the contract was not to be performed in Florida, and the alleged breach did not occur in Florida. *See* D.E. 9 at 4; D.E. 9-7. Although Calixto obtained permission to file an interlocutory appeal of the order granting CRT's motion to dismiss, Calixto voluntarily dismissed his action in state court, subsequently filing the Complaint [D.E. 1] at issue in the instant case.

The pending Complaint alleges that WABO engaged in tortious interference with a contractual relationship. *See* D.E. 1 at Count 1. More specifically, Calixto asserts that WABO "intentionally and unjustifiably interfered with the Agreement between Calixto and CRT, by causing

CRT's breach and disregard of the 'Agreement Not to Compete,' and the right of consent of assignment provided for in the Agreement."[1]  D.E. 1 at ¶ 28.

### 1.  Plaintiff's Motion to Compel

During the course of discovery in this case, Calixto took the deposition of Burri and the Rule 30(b)(6), Fed. R. Civ. P., deposition of WABO.[2]  D.E. 86 at 1-2.  Burri, as previously noted, had represented CRT in the 2003 Agreement negotiations.  He also had served as the CEO for WABO until August 1, 2004, when he left WABO to take a position at another Degussa entity in Switzerland.  D.E. 90 at 2-3.  During the course of his deposition, Burri testified as follows with regard to what he understood WABO's policy for storage of electronic information to be at the time of his departure:

> Q:  Was there any document destruction policy in effect at Watson Bowman to erase servers or to eliminate documents in any certain periods of time?
>
> A:  I think we had some policy.  If I'm not mistaken, we have to keep for a minimum of ten years, and it could also be a different period than ten years.  But we had a policy and, when it came to electronic e-mails, I mean, these were stored every – I don't know exactly – every second day, every one week, and filed outside of the building.  So we had some policy, yes, for how long a minimum we have to keep, yes.

---

[1]Originally, the Complaint also alleged against BASF CC a cause of action for tortious interference with a contractual relationship.  See D.E. 1 at Count 2.  Following jurisdictional discovery, however, Calixto filed a motion to dismiss BASF CC because the Court lacked diversity jurisdiction over BASF CC and, as Calixto conceded, BASF CC was not an indispensable party.  See D.E. 53.  Calixto similarly filed a motion to dismiss, and the Court granted that motion, leaving WABO as the sole remaining Defendant in this action.

[2]Rule 30(b)(6), Fed. R. Civ. P., authorizes a party to take the deposition of an entity by describing with reasonable particularity in the deposition notice the matters for examination.  The named organization must then designate at least one person to testify on its behalf with regard to the specified matters.

Q:    Do you recall what the minimum was for e-mails?

A:    I'm not sure, but I think it was ten years.

Q:    So would it be your understanding, so far as the policy that was in effect at that time was concerned, that your e-mails should still be intact wherever those e-mails are kept by Watson Bowman off premises?

A:    I would expect this, yes.

D.E. 86-3 at 3.

At WABO's Rule 30(b)(6) deposition, Richard Patterson, the business director of WABO at the time, testified first. *Id.* at 2. Observing that WABO had made available to Plaintiff for Patterson's deposition "a number of e-mails from 2008," Plaintiff asked Patterson about any efforts WABO might have undertaken to obtain information concerning the deposition topics, for the period before 2008. D.E. 86-2 at 3. Patterson explained that he had inquired of BASF CC's information technology department ("BASF CC IT") regarding pre-2008 materials, and BASF CC IT indicated that it retains some "back-up tapes" for WABO's computers, but those back-up tapes are housed by BASF CC, not WABO. *Id.* According to BASF, Patterson continued, the tapes were for "back-up purposes only," and BASF CC IT would not extract any information from those tapes for Patterson. *Id.*

Subsequently, Plaintiff inquired whether WABO had paper files relating to the period from November, 2003, until the date of the deposition (November 18, 2008). D.E. 86-2 at 4. Patterson responded affirmatively and indicated that WABO had conducted a search of those paper files. *Id.*

Plaintiff also asked WABO about what IT information it had available to search for information responsive to the deposition notice. D.E. 86-2 at 4. Patterson replied,

A:     We have six months' worth of information on our – I believe it's six months which is available to us before.  It's the information off of our Lotus notes database which is nothing more than our e-mail system is purged.

Q:     That is a purge program that's been in effect for some period of time?

A:     BASF [CC] put it in effect when they acquired the business.

*Id.*  Upon learning of the purge program, Plaintiff inquired further:

Q:     Prior to that was there a purge program in existence?

A:     A corporate purge program?

Q:     A program which purged the Lotus notes or whatever based system you had.

A:     I don't know the answer to that question.

Q:     Who would know the answer to that?

A:     I don't know.

Q:     Well, was there an IT person at Watson Bowman more than six months ago?

A:     Yes.

Q:     And who was that?

A:     Molly Young.

Q:     For how long has she been with Watson Bowman?

A:     I don't know the exact number of years, but she was hired in the 1980's.

Q:     So she has been responsible for IT during the course of her employment?

A:     For Watson Bowman Acme, yes.

> Q:   So would she be the person to ask about whether there was a
>       purge program in effect . . . [b]efore BASF [CC]?
>
> A:   She would probably be more appropriate.  I don't know that
>       she would have all the answers.

*Id.*

Based on this testimony from Burri and Patterson, Calixto filed the Motion to Compel.  In his Motion to Compel, Calixto asks the Court to find that WABO and BASF CC have spoliated electronic documents "in the face of ongoing litigation."  D.E. 86 at 6.  Thus, Calixto urges, the Court should require WABO to obtain and pay for restoration and a search of the back-up tapes referred to by Patterson during his deposition testimony.  *Id.*

On September 16, 2009, the Court held a hearing on Plaintiff's Motion to Compel.  During the hearing, it became apparent that Calixto challenges two specific aspects of WABO's production efforts: (1) the destruction of Burri's e-mails on his hard drive after Burri left WABO, and (2) WABO's refusal to restore the monthly back-up tapes.  With respect to the first issue, WABO essentially argued that as a matter of policy, it routinely destroys electronic documents from the hard drives of separated employees, and, in the case of Burri, that destruction occurred after July 31, 2004, when Burri left WABO, but before December 1, 2004, the date of the earliest information saved on the back-up tapes.  Thus, no record of Burri's e-mails exists, and WABO cannot recover the e-mails from anywhere.

As for the second issue, WABO contended that nothing relevant that had not already been turned over exists on the back-up tapes.  In this regard, WABO explained that it had identified all employees who could fairly be expected to have information relevant to the pending lawsuit, and it had instructed them to retain their documents and had exempted their documents from the automated

destruction policy subsequently instituted by BASF CC when it took over WABO.  Moreover, WABO argued, it had conducted a thorough search of the electronic and paper documents of all individuals subject to the legal hold.  Hence, WABO reasoned, the back-up tapes do not hold any documents not already accounted for by WABO's legal hold, search, and prior productions.  As a result of the hearing, the Court ordered WABO to file with the Court by September 29, 2009, an affidavit explaining, among other matters, (1) how WABO conducted its search for documents responsive to the deposition notice and discovery obligations; (2) what, if any, documents had been deleted from WABO's IT system, and the circumstances surrounding any such deletions; and (3) what, if any, options existed for recovery of any deleted documents.

Accordingly, on September 29, 2009, WABO filed the Second Declaration of Molly Young[3] [D.E. 126-2].  In her Second Declaration, Young noted that she has been responsible for information technology at WABO since 1994.  *Id.* at ¶ 2.  Therefore, Young attested, she "was involved in the gathering of documents responsive to the request of Plaintiff Jorge Calixto*"* in the instant matter. *Id.*

As it relates to the search procedures and efforts employed by WABO in this case, the Second Young Declaration reported that WABO first identified and contacted all WABO employees "who had any possible contact with Plaintiff . . . , or who had any possible knowledge of the JEENE Trademark, the ALADIN Trademark or the '381 Patent or possibly had any information relating to the Lawsuit or to Plaintiff['s] . . . document requests . . . ."  *Id.* at ¶ 3(a).  According to Young, the resulting group of individuals included Richard Patterson, Michael Turchiarelli, Tom Calos, Craig

---

[3]In support of its Response to Calixto's Motion, WABO had filed a first Declaration of Molly Young.  *See* D.E. 90-3.

Gaume, Gary Moore, Chris Wierzbowski, and Audrey Morely.  *Id.*  Pursuant to the process followed by WABO, WABO instructed these individuals to search their personal electronic records, including their personal hard drives and computer files, and their personal hard copy records for any responsive documents or information.  *Id.*  Additionally, WABO searched the Lotus Notes mailboxes of the selected group.  *Id.*

Besides these efforts, Young continued, she searched the server house directories, the shared drives, and the individual files (including archive files) for the identified individuals for keywords and terms, including the terms "Degussa," "BASF," "CORTE,"[4] "Calixto, "Asset Purchase Agreement," "'381 Patent," "JEENE," and "ALADIN."  D.E. 126-2 at ¶ 3(b) and (d).  WABO also directed the identified individuals to search their local hard drives and Lotus Notes mailboxes for the same search terms.  *Id.* at ¶ 3(b).  Young further explained that Patterson made personal inquiries of those identified as possibly having responsive information or documents, asking about their knowledge and the location of any pertinent information.  *Id.* at ¶ 3(c).

According to Young, WABO made available to its counsel all documents obtained through the efforts outlined above.  D.E. 126-2 at ¶ 3(e).  Counsel, in turn, either provided the responsive documents to Plaintiff or identified them on a privilege log.  *Id.*  Young affirmatively added that "[n]one of the [responsive] [d]ocuments . . . were deleted or destroyed in any manner or form."  *Id.* at ¶ 4.  Thus, Young's Second Declaration implicitly suggested that reconfiguring the back-up tapes into a searchable format and then searching the reformatted version would not yield additional responsive documents because everything reasonably anticipated to be relevant to the litigation was preserved via the litigation hold and searched pursuant to the procedures articulated above.

_____

[4]"CORTE" is the name that WABO uses for the entity that this Order refers to as "CRT."

With respect to the deletion of the Burri e-mails, Young asserted that "it is routine business practice and remains a routine business practice to delete an employee's individual e-mail file from the Lotus Notes mailbox on the Watson Bowman server once he or she leaves the employ of Watson Bowman." D.E. 126-2 at ¶ 5. Young conceded, however, that WABO has no written policy memorializing this practice. *Id.* Rather, Young attested, "The deletion . . . of . . . Burri's e-mail file from the Watson Bowman e-mail system was routine, and it was done as a security measure and in accordance with Watson Bowman's routine practice." *Id.* Although Young averred that the deletion occurred after Burri left on August 1, 2004, and before December, 2004, Young could not specify precisely when during that interval WABO deleted Burri's e-mail file. *Id.* Nevertheless, Young stated, "The deletion of . . . Burri's e-mail file from the Watson Bowman server . . . was done with no knowledge of a letter dated September 9, 2004 (threatening litigation) . . . , which was not addressed or sent to Watson Bowman, but rather was addressed to, and sent via fax and mail to, [CRT], in Trostberg, Germany." *Id.*

Finally, the Second Young Declaration discussed the accessibility of the WABO back-up tapes. As Young explained the situation, since she began her employment with WABO in 1994, WABO has created monthly back-up tapes of its electronic server to enable it to reconstruct its database in the event of a disaster. D.E. 126-2 at ¶ 6. Because each back-up tape must store a "huge amount of data," the tapes maintain the data in a compressed format that is not accessible. *Id.* Consequently, to search the data contained on the back-up tapes, WABO must restore it to an accessible format. *Id.* Moreover, Young reported, WABO employs a standard practice of maintaining a continual rotation of back-up tapes, allowing the tapes to be re-used every thirty months, or so, because the back-up tapes are expensive and they serve the purpose only of

maintaining a recent version of WABO's electronic information to enable WABO to restore it in the event of a disaster.  *Id.*  According to Young, for the relevant time frame, WABO currently holds thirty month-end back-up tapes from the WABO system, which are dated from December, 2004, through July, 2007, plus July, 2007.  *Id.*  Young attested that WABO has not yet reused the tapes kept since December, 2004, only because of the pending lawsuit.  *Id.*

Upon obtaining leave from the Court, on October 2, 2009, Calixto filed his Response to Second Declaration of Molly Young [D.E. 129].  In this filing Calixto took issue only with the aspects of the Second Young Declaration addressing deletion of the Burri e-mails.  More specifically, Calixto noted that although Young stated that the September 9, 2004, letter indicating that litigation was highly probable was not sent to WABO but instead was transmitted to CRT in Germany, the evidence shows that WABO soon thereafter became aware of the September 9, 2004, letter, as demonstrated by its attorney's disagreeing with the contentions of the September 9, 2004, letter in a letter dated September 30, 2004.  D.E. 129 at 1.  A review of the September 30, 2004, letter, reflects that it is written by James Pendergast on Degussa letterhead, and it does not mention WABO.  *See* D.E. 114-10.

Because a factual issue regarding the intent behind the destruction of the Burri e-mails existed, the Court set an evidentiary hearing regarding this matter.  At the November 12, 2009, evidentiary hearing,[5] WABO presented the testimony of Molly Young and James Pendergast.  Young

---

[5]Originally, the Court set the matter for an evidentiary hearing to be held on October 14, 2009.  *See* D.E. 130.  After Defendant moved to reset the hearing, *see* D.E. 132, the parties jointly requested that the Court reschedule the hearing for November 12, 2009, because of scheduling conflicts each of the attorneys had.  Accordingly, the Court reset the hearing for November 12, 2009.  *See* D.E. 133.  As the Court noted in that Order, however, the parties may not rely on the delay occasioned by the granting of the requested continuance in seeking extensions of any other deadlines already set in this case.  *See id.* at 1-2.

testified primarily regarding WABO's practice of deleting e-mail mailboxes of separated employees in general, as well as the deletion of Burri's e-mail mailbox in particular.  Additionally, she discussed how WABO conducted the electronic document search in this case and what her role in that search involved.  Pendergast, senior counsel for BASF, attested to when he viewed WABO as anticipating litigation regarding the matters in this case and how and when WABO instituted litigation holds in response.

The Court reviews Young's testimony first.  Young stated that she routinely deleted the e-mail mailboxes of separated employees and that she did so in order to free up space on WABO's servers.  According to Young, her primary responsibility requires her to keep WABO's computer equipment secure and functional.  Over time, however, employees store a tremendous amount of information on the company's computers, particularly because WABO engages in computer-assisted design ("CAD") projects that tend to sap much computer memory.  As the servers get closer to reaching full storage capacity, the computer system slows down tremendously, eventually resulting in a crash where information can be lost.  Consequently, when the servers start to approach the critical threshold, Young explained, she looks for ways to liberate space on the system.

Young testified that to accomplish this goal, since approximately 1997 or 1998, when WABO began using its current computer system, Young, on her own initiative, has deleted e-mail boxes of departed employees.  As Young explained, this was her own idea, which she undertook without reviewing the content of the deleted information and which she did for the sole purpose of keeping WABO's system functional.  Nevertheless, Young admitted that she told Michael Turchiarelli, her boss at the time and the controller of the company, that in order to make more computer space, she was deleting e-mail mailboxes of employees who had left WABO.  As for the deletion of Burri's e-

mail mailbox in particular, Young testified that she deleted Burri's e-mail mailbox after his departure on July 31, 2004, and, she believed, before December 1, 2004, although she admitted that she could not be certain that she engaged in this act before December 1, 2004, when the first back-up tapes begin. She further attested that no one suggested to her that she delete Burri's e-mail mailbox, but, rather, that she did so on her own initiative for the purpose of freeing up computer space. Young further stated that at the time that she deleted Burri's e-mail mailbox, she had no awareness of Calixto or his potential claim against WABO.

With regard to the relevance of the back-up tapes as they pertain to the non-Burri records, Young testified that she first learned of the instant matter in September, 2008, when she was asked by counsel to conduct searches and gather information. According to Young, Richard Patterson assisted in the search. As Young explained in her affidavits, Young searched the common computer systems for the keywords previously identified. She also searched electronic database areas belonging to the individuals noted in her affidavits for those same keywords. After obtaining all responsive information, Young compiled it on a disc and provided it to counsel for further processing. As for BASF's program that automatically purges e-mails older than six months (put in place after BASF acquired WABO), Young noted that the e-mails of those individuals on litigation hold were exempt from the automatic deletion program.

James Pendergast, senior counsel at BASF since July 1, 2006, testified that prior to his employment with BASF, Pendergast worked for DCCI since April, 2001, as an attorney for the company. As Pendergast explained, he began working for BASF when BASF purchased DCCI. Before joining DCCI, Pendergast was employed by SKW, which, in turn, owned WABO prior to DCCI's purchase of the entity. Because of Pendergast's employment history, he testified, he has

dealt with Calixto since 1999.

Plaintiff's counsel showed Pendergast Plaintiff's Exhibit ("PX") 1, a March 1, 2004, letter from Plaintiff's counsel to Burri as president of WABO, with copies to, among others, Pendergast. In this letter, described in the "re" block as "Proposed Exclusive License Agreement Between Jorge Calixto and Shanghai Master Builders Co., Ltd.," Plaintiff's counsel "confirm[ed]" that negotiations between Calixto and Shanghai Master Builders Co., Ltd., had "reached an impasse" and that no further discussions regarding the proposed license would occur.  PX1.  Thus, Plaintiff's counsel explained, WABO, along with others, was prohibited under the Agreement from making, distributing, or selling any product using the process set forth in the Patent and from using the JEENE trademark in the Asia/Pacific Territory.  *Id.*  Plaintiff's counsel further explained, "In the event that any of the Degussa Entities engage in [such activities] within the Territory, Calixto will enforce his rights and remedies under the Asset Purchase Agreement, as well as his common law and/or statutory rights in the relevant jurisdiction."  *Id.*  The letter further demanded royalty payments on all licensed products sold by the Degussa Entities in the United States, Canada, and the Caribbean between July 1, 2003, and December 31, 2003.  *Id.*

Pendergast testified that he did not recall reviewing this letter.  Nevertheless, upon consideration of the letter during the hearing, Pendergast stated that he did not view it as threatening imminent litigation against WABO because (1) he saw the letter as a demand letter for royalty payments; and (2) WABO is not a signatory to the Asset Purchase Agreement discussed in the letter.

Pendergast also answered questions concerning a September 9, 2004, letter from Plaintiff's counsel to CRT, copied to, among others, senior counsel for DCCI.  D.E. 114-10.  The "re" block on this letter reads, "Breach of Asset Purchase Agreement dated November 17, 2003 by and Between

-16-

[CRT] and . . . Calixto." *Id.*  In this letter, Plaintiff's counsel reminded CRT that under the

Agreement, CRT agreed that neither it nor its affiliates would (1) import, manufacture, distribute,

or sell within the Asia/Pacific Territory any product whose manufacture employs the process in the

Patent, nor (2) use the JEENE trademark outside the United States, Canada, and the Caribbean.  *Id.*

at 2-3.[6]  Nevertheless, the letter alleges that CRT was engaging in precisely these activities within

the Asia/Pacific Territory.  Among other instances, Plaintiff's counsel cited a WABO announcement

that it had "changed the name of the 'JEENE' system to 'Aladin' as of 1st January 2004.'" *Id.* at 3.

The letter concluded by demanding that CRT

> cease and desist from engaging in [such] activities.  Furthermore, . .
> . Calixto is entitled to damages as a result of the breach of the
> Agreement, including the attorneys' fees and costs he has incurred
> pursuant to Section 10.2 of the Agreement.  Unless we receive a
> written response from [CRT] within ten (10) days of your receipt of
> this notice detailing its intended actions for addressing these matters
> and compensating . . . Calixto, . . . Calixto has authorized us to pursue
> all rights and remedies available to him under the Agreement and in
> accordance with applicable law.

*Id.*

Pendergast testified that he remembered receiving this letter, but he did not view it as

triggering document retention requirements at WABO because (1) the letter was about CRT's alleged

breach of the Agreement, and WABO was not a party to that Agreement,  (2) it did not appear to him

as though litigation was imminent, based on this letter, and (3) even had it appeared so, because CRT

is a German entity and Calixto is a citizen of Brazil, Pendergast did not anticipate that litigation in

the United States would occur, and document preservation and discovery requirements in other

---

[6]The Court refers to the page numbers imprinted on D.E. 114-10 by the Court's CM/ECF
system.

countries can differ substantially from those in the United States. As Pendergast described during his testimony, he formulated a response to this letter on behalf of CRT, not WABO, because "the letter had nothing to do with WABO."

Instead, Pendergast attested, he did not consider that WABO might be sued until Calixto actually filed suit against WABO and others in Florida Circuit Court and served it on WABO. More specifically, Pendergast stated, on March 30 or 31, 2005, after learning of the lawsuit, he put a litigation hold in place. Pursuant to this litigation hold, Pendergast instructed Patterson and Turchiarelli to collect and maintain all relevant documentation and to instruct all others with pertinent information to do the same thing. In addition, Pendergast spoke with Burri, who informed Pendergast that he had put everything he had had regarding the Agreement in a folder in Patterson's office in Amherst prior to leaving WABO. According to Pendergast, WABO had this litigation hold in place as of March 30 or 31, 2005, and it remains effective today, despite the dismissal of the state action. When Calixto filed the case in federal court, Pendergast explained, he revisited the preservation of documents with WABO, based on the new charge of tortious interference.

Following Pendergast's testimony, the Court recessed to consider the evidence. This matter is now ripe for decision.

### *2. Plaintiff's Motion for Letters of Request*

In an effort to develop the evidence in this case further, Plaintiff filed his Motion for Letters of Request. In this Motion, pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, 28 U.S.C. § 1781, and Rule 28(b), Fed. R. Civ. P., Plaintiff asks the Court to issue letters of request, applying for international judicial assistance to cause service of subpoenas *duces tecum* on affiliates of WABO located in other countries. *Id.* at 1; *see also* D.E. 95

at 2.

More specifically, Calixto seeks to obtain letters of request enabling service of subpoenas *duces tecum* to proceed against BASF SE Construction Chemicals Division, in Germany; BASF Construction Chemicals Asia Pacific in Shanghai, China; Sanfield Industries Ltd. in Hong Kong; and Vispack Co., Ltd., in Thailand. These subpoenas seek documents relating to the Patent, the JEENE Trademark, and ALADIN and are directed primarily at documents regarding manufacturing, sales, orders, marketing, pricing, and profitability of JEENE and ALADIN products. *See* D.E. 89-3, D.E. 89-5, D.E. 89-7, D.E. 89-9. WABO objects to the issuance of the letters of request because WABO asserts that it has already provided Calixto with documents in its possession regarding all sales during the relevant time frame that WABO made of products bearing the identification "JEENE" to the Asia/Pacific Territory. D.E. 95 at 1.

## *II.  Analysis*

### A.  Plaintiff's Motion to Compel

The Court must address two issues in resolving Plaintiff's Motion to Compel: (1) whether WABO's alleged destruction of the Burri e-mails or its process of searching for documents relevant to this litigation and responsive to Calixto's requests was deficient to the extent that it justifies an order from the Court directing WABO to engage in sampling or some other methodology requiring WABO to reconfigure any or all of its back-up tapes and conduct a search of them; and (2) whether WABO's destruction of the Burri e-mails in 2004 constitutes spoliation warranting some type of sanction. Because these inquiries involve different considerations, the Court considers each issue separately.

### *1.  The Sufficiency of WABO's Search*

The Court begins its analysis of whether WABO's search efforts warrant the imposition of an order requiring WABO to undertake reconstruction of its database by looking to Rule 26(b)(2)(B), Fed. R. Civ. P.  This rule provides,

> *Specific Limitations on Electronically Stored Information*.  A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost.  On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost.  If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C).  The court may specify conditions for the discovery.

Fed. R. Civ. P. 26(b)(2)(B).  Among other reasons, Rule 26(b)(2)(C), in turn, directs the court to limit discovery when it finds that the discovery sought is, as relevant to the analysis in this case, unreasonably cumulative or duplicative.

In the instant matter, Calixto seeks an order requiring WABO to reconfigure its back-up tapes and perform a search of them for documents relevant to this litigation.  Consequently, under Rule 26(b)(2)(B), the burden falls on WABO to demonstrate that the information that Calixto seeks is not reasonably accessible because of undue burden or cost.  Here, WABO has satisfied that obligation.  As previously noted, the back-up tapes store information in a compressed form that is not accessible unless it is reformatted.  WABO has submitted an estimate from Kroll Ontrack, an outside vender, stating the cost to restore these back-up tapes to a searchable format.  *See* D.E. 90-5.  According to the estimate, restoring all of the tapes and searching them for keywords will likely cost approximately $40,000.00.  *Id.*  WABO would then have to review for relevance and privilege any documents resulting from this endeavor, a task that would impose additional costs on WABO.  *Id.*

-20-

Based on this information, the Court concludes that WABO has satisfied its initial burden of showing that the materials that Calixto seeks from the back-up tapes are not reasonably accessible because of undue burden or cost.

The question then becomes whether Calixto has, nonetheless, demonstrated good cause for the Court to require WABO to restore and search the back-up tapes, despite the cost and burden. Under the circumstances of this case, the Court finds that, for the most part, Calixto has not.

The Court is well aware of the electronic discovery analysis set forth by the *Zubulake v. UBS Warburg, LLC,* opinions and subsequent cases, as well as of the ideals embodied in the Sedona Principles, and fully appreciates the considerations raised by these pioneering writings. Nevertheless, in this matter, the Court need not travel down the *Zubulake* road because the question before the Court is an elementary one that must be answered in all discovery matters, regardless of whether the medium of the discovery sought happens to be electronic in nature: whether we can reasonably anticipate that the information to be gleaned from the discovery sought will be relevant and non-duplicative. After all, electronic discovery is, at bottom, just discovery, and, as Rule 26(b)(2)(B) makes clear, the usual limitations to which all discovery is subject apply with equal force to electronic discovery.

Here, the Court finds that Calixto has failed to establish a reasonable expectation that restoring and searching all of the back-up tapes will yield relevant documents that WABO's other search methods have not. In this regard, the Court notes that although Calixto originally requested an order requiring WABO to restore and search its back-up tapes, following WABO's submission of the Second Young Declaration, Calixto raised no objections to the adequacy of WABO's search methods, including, among other procedures, the keywords that WABO chose to use in performing

its search for relevant and responsive material from its electronic databases.  Moreover, the Court's independent review of WABO's specified search methodology reveals that it appears to have been designed to find relevant information, and no significant gaps in the methodology are obvious to the Court.  Moreover, although WABO conducted the electronic search in September, 2008, Pendergast testified that he directed the imposition of a litigation hold on all records as of approximately March 31, 2005.  Consequently, relevant documents on WABO's computer system as of March 31, 2005, should have continued to exist on WABO's computer system at the time of the September, 2008, search.

Indeed, as a result of the search methods WABO employed, the electronic records of all WABO employees who might have had any documents relevant to this litigation, for the period from March 31, 2005, forward, should have escaped destruction under WABO's document destruction policy and should have been produced or identified on a privilege log.  Furthermore, WABO has asserted that it ran a keyword search on the subject employees' electronic records.  Calixto has objected neither to the list of employees whose records were preserved nor the keywords WABO employed in conducting its search.  In view of the fact that a search of the restored back-up tapes would involve use of the same keywords already employed, and further, because Calixto's failure to object to the list of employees placed on a litigation hold suggests that WABO would be unlikely to find responsive information in the restored records of any employee not subject to the preservation order, the Court concludes that, for the most part, Calixto has failed to establish that a search of the reconfigured back-up tapes would result in the collection of any relevant documents that have not already been produced or identified on the privilege log.  Consequently, under Rule 26(b)(2)(C), the Court "must limit the frequency or extent of discovery otherwise allowed . . . ."  The Court declines

to impose additional costs on WABO for a generalized search of all of its back-up tapes that should generate nothing more than WABO has already produced or identified on a privilege log.

The Court, however, does not reach the same conclusion with regard to the December, 2004, back-up tape. Young, who testified that she deleted Burri's e-mail mailbox, conceded that she could not be certain that she had done so prior to December 1, 2004, the first date for which WABO possesses back-up tapes of its computer systems. As a result, the Court cannot find that a search of the December, 2004, will yield duplicative discovery. Moreover, the cost of reconfiguring and reviewing one of the thirty-plus back-up tapes is far less than engaging in this practice for all of them. Indeed, the Court cannot say that the cost imposes an undue burden on WABO, thereby rendering the discovery sought not reasonably accessible. Consequently, the Court grants Calixto's Motion to the extent that it seeks an order requiring WABO to reconfigure and search the December, 2004, back-up tape for discoverable records.[7]

## 2. Spoliation Sanctions

Finally, Calixto asks the Court to impose spoliation sanctions in connection with WABO's alleged destruction of the Burri e-mails in this case. Even if the December, 2004, back-up tape does not yield the Burri e-mails, however, the Court declines to impose spoliation sanctions.

In diversity cases such as this one, the Eleventh Circuit has held, federal law governs spoliation issues. *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005) (citations omitted). This results from the fact that spoliation sanctions constitute an evidentiary matter, and

---

[7]As long as WABO must search for Burri's e-mails, it imposes only minimally more burden for WABO to search for other discoverable records as well. Because the litigation hold was not in place until March 31, 2005, requiring WABO to search for all discoverable records does not impose upon WABO an obligation to conduct duplicative discovery.

-23-

in diversity cases, the Federal Rules of Evidence govern the admissibility of evidence in federal courts.  *Id.*

Spoliation is the "intentional destruction, mutilation, alteration, or concealment of evidence, usu. a document." *Black's Law Dictionary* 1437 (8th ed. 1999); *see also Green Leaf Nursery v. E.I. Dupont de Nemours and Co.,* 331 F.3d 1292, 1308 (11th Cir. 2003) (citing *Aldrich v. Roche Biomedical Labs., Inc.*, 737 So. 2d 1124, 1125 (Fla. Dist. Ct. App. 1999) (quoting *Black's Law Dictionary* 1401 (6th ed. 1990))).  Here, Calixto alleges that WABO engaged in spoliation of Burri's e-mails when it destroyed them some time after August 1, 2004.

In considering Calixto's contention, the Court first notes that the federal courts possess certain implied powers that are "necessary to the exercise of all others." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (citing *United States v. Hudson*, 7 Cranch 32, 34 (1812) and *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980) (citing *Hudson*)).  "These powers are 'governed not by rule of statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Id.* (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962)).  A court's "inherent power extends to a full range of litigation abuses." *Chambers,* 501 U.S. at 46.  Among these powers, the federal district courts have the authority to regulate litigation and to sanction litigants for abusive practices. *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 126 (S.D. Fla. 1987) (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980); *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 951 (9th Cir. 1976); *Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F. Supp. 1443, 1455 (C.D. Cal. 1984)).

To manage these responsibilities, the court may impose a broad spectrum of sanctions, including the application of an adverse inference against a party, among other possible sanctions,

where the court finds that the party has engaged in spoliation of evidence.  *Martinez v. Brink's, Inc.*, 171 F. App'x 263, 269 n.7 (11th Cir. 2006).  The adverse inference makes a finding or imposes a rebuttable presumption that the missing evidence would have been unfavorable to the party engaging in the misconduct.  "The key to unlocking a court's inherent power requires a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998); *see also Cox v. Target Corp.*, 2009 WL 3497730, *2 (11th Cir. Oct. 30, 2009) ("A jury instruction on spoliation of evidence is required 'only when the absence of that evidence is predicated on bad faith.") (citing *Bashir v. Amtrak*, 119 F.3d 929 (11th Cir. 1997)).

By way of example regarding the meaning of "bad faith" necessary to justify imposition of an adverse inference, in *Telectron, Inc.*, 116 F.R.D. at 133-34, Judge Marcus held that entry of default judgment as to the defendant corporation's liability in a complex antitrust case was an appropriate sanction for active and willful destruction of documents requested by the plaintiff.  In his ruling, Judge Marcus found bad faith where the evidence demonstrated that the "[d]efendant's actions were unequivocally motivated by the flagrant bad faith of [the defendant's] in-house counsel and corporate secretary, who explicitly and urgently called for the destruction of records in a category directly related to the opposing party's claims on the very date that he became aware of those claims." *Id.*  Indeed, Judge Marcus concluded that the defendant's counsel's active directive to destroy documents upon his receipt of the plaintiff's complaint and request for documents was "specifically designed and intended to obscure [the defendant's] history of anticompetitive endeavor, and to impede and obstruct Telectron's right to an honest and open discovery process." *Id* at 110.  Judge Marcus concluded that based on the evidence, this was a "willful and premeditated scheme" indicating bad faith and that it "warrant[ed] the inference that the destroyed documents would have

-25-

been harmful to [the defendant], had they been produced." *Id.* at 134.

Similarly, in *Flury*, 427 F.3d at 944-45, the court found evidence of bad faith in the active and knowing destruction of the allegedly defective vehicle in a motorist's suit against the manufacturer.   In *Flury*, the evidence demonstrated that the plaintiff "knew the location and condition of the subject vehicle following the accident, . . . was fully aware that defendant wished to examine the vehicle, . . . . [and] [k]nowing this, the plaintiff ignored the defendant's request and allowed the vehicle to be sold to salvage without notification to defendant . . . ." *Id.*  The court held that the "plaintiff should have known that the vehicle, which was the very subject of his lawsuit, needed to be preserved and examined as evidence central to his case." *Id.*  Consequently, the court upheld the district court's instruction to the jury to apply a rebuttable presumption that the evidence not preserved was unfavorable to the party responsible for the spoliation.

However, "'[m]ere negligence' in losing or destroying the records is not enough for an adverse inference, as 'it does not sustain an inference of consciousness of a weak case.'" *Bashir*, 119 F.3d at 931 (internal citations omitted).   "Court[s] should not infer that the missing evidence was unfavorable unless the circumstances surrounding the evidence's absence indicate bad faith." *Optowave Co., Ltd. v. Nikitin*, 2006 WL 3231422 (M.D. Fla. Nov. 7, 2006), at * 8 (citing *Bashir*, 119 F.3d at 931).   For example, in  *Bashir*, 119 F.3d at 931, the court held that the unexplained absence of the defendant corporation's (appellee's) train's speed tape in a wrongful death suit did not warrant an adverse inference that the train was traveling at excess speed when it struck the pedestrian.   In its analysis, the court  noted that it would "not infer that the missing speed tape contained evidence unfavorable to appellees unless the circumstances surrounding the tape's absence indicate[d] bad faith, e.g., that appellees tampered with the evidence." *Id.*  The court held that with

-26-

"no probative evidence" that "appellees purposely lost of destroyed the relevant portion of the speed tape," it could not infer bad faith.  *Id.*

The court also declined to find bad faith for mere negligence in *Slattery v. Precision Response Corp.*, 167 F. App'x 139, 141 (11th Cir. 2006).  In this case, the court held that an employer's failure to produce documents did not warrant an adverse inference in an employment discrimination case because the plaintiff had demonstrated "no evidence that [the defendant] withheld or tampered with any of the documents in bad faith."  *Id.*

Likewise, in *Penalty Kick Management, Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1293-94 (11th Cir. 2003), among other bases, the plaintiff sued Coca Cola for allegedly disclosing the plaintiff's trade secrets to a third party.  During the course of business negotiations in which Coca Cola investigated the possibility of obtaining exclusivity to use the plaintiff's label design, the plaintiff disclosed certain trade secrets to Coca Cola regarding the label design.  Coca Cola agreed not to disclose the trade secrets to others.  While Coca Cola was in discussions with the plaintiff regarding the possible business deal, Coca Cola also was in contact with a third party, which it asked to design a label for it.  The plaintiff alleged that the label design developed by the third party demonstrated that Coca Cola had revealed the plaintiff's trade secrets to the third party.  While Coca Cola claimed that it did not disclose any of the plaintiff's trade secrets to the third party, the evidence showed that Coca Cola had, nonetheless, prepared a "mock-up" of the label type it envisioned, which incorporated some of the features of the plaintiff's label system.  In discovery, the plaintiff sought a copy of the mock-up that Coca Cola provided to the third party.  When Coca Cola could not produce the label, the plaintiff sought an adverse inference that the mock-up would have demonstrated that Coca Cola had disclosed the plaintiff's trade secrets to the third party.  The court

denied the request, explaining the absence in the record of any indication of bad faith by Coca Cola in losing the label at issue precluded the award of the adverse inference.  *Id.* at 1294; *see also Perdue v. Union City, Georgia*, 2006 WL 2523094, *10 n.6 (N.D. Ga., Aug. 28, 2006) (declining to find bad faith to infer adverse inference for loss of videotape by defendant where "no evidence that any defendant destroyed or tampered with tape").  Although the Court notes that the opinion in *Penalty Kick Management* does not describe the circumstances under which the label was lost, unlike in *Telectron* and *Flury*, nothing in the *Penalty Kick Management* opinion indicates that Coca Cola failed to preserve the evidence in question at a time when it was on notice that the label would be relevant to a claim by the plaintiff in that case.

Taken together, these cases demonstrate that bad faith can be found based on direct evidence or on circumstantial evidence where certain factors converge.  More specifically, where no direct evidence of bad intent exists, in this Circuit, bad faith may be found on circumstantial evidence where all of the following hallmarks are present: (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator.

The Court now applies these factors to the missing Burri e-mails.  With regard to the first factor, WABO concedes that Burri's personal e-mails existed prior to August 1, 2004.  Considering that (1) Burri is the individual who negotiated the Agreement with which Calixto asserts WABO tortiously interfered, (2) Burri served as the CEO of WABO until his departure from that entity on

-28-

July 31, 2004, and (3) the record contains admissions that WABO, in fact, engaged in shipments of some JEENE products to countries within the Asia/Pacific Territory during the period when Burri served as the CEO of WABO, *see, e.g.*, D.E. 114-1 and D.E. 114-2, the Court concludes that Burri's e-mails may fairly be supposed to have contained information material to the matters at issue in this case.

As for the second factor, based on Young's affidavits and testimony, there is no question that WABO affirmatively caused the evidence to be lost when Young intentionally deleted Burri's e-mail mailbox.  With respect to the third factor, it is not clear whether Young deleted the e-mails at a time when WABO should have known of a duty to preserve the evidence.  As Judge Marcus noted in *Telectron*, 116 F.R.D. at 127, "'Sanctions may be imposed against a litigant who is on notice that documents and information in its possession are relevant to litigation, or *potential litigation* . . . . [A litigant] is under a duty to preserve what it knows, or reasonably should know, is relevant in the action . . . .'" (citations omitted) (emphasis added); *see also Silvestri v. Gen'l Motors Corp.*, 217 F.3d 583, 591 (4th Cir. 2001) ("The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation.") (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998), *overruled on other grounds by Rotella v. Wood*, 528 U.S. 549 (2000)).

In the matter before the Court, although Calixto argues that the March 1, 2004, letter (D.E. 114-10) should have triggered an obligation on the part of CRT and its affiliates to preserve evidence, the Court disagrees.  Nothing about the March 1, 2004, letter suggests that litigation concerning the matters at issue in the pending case was imminent at the time that Plaintiff's counsel sent the March 1, 2004, letter.  Instead, the March 1, 2004, letter reminds Burri and WABO that as

Degussa Entities, they are prohibited from selling JEENE-type products or using the JEENE trademark in the Asia/Pacific Territory, and it seeks payment of royalties on sales of JEENE products in North America and the Caribbean.  This letter does not put WABO or its parent company at the time on notice that Calixto anticipates suing WABO for tortious interference with Calixto's contract with CRT.

Nor can the Court find that the September 9, 2004, letter triggered a duty on the part of WABO to preserve Burri's e-mails.  Plaintiff's counsel addressed this letter to CRT in Germany, and, while the letter was copied to Burri, it was directed to him at Degussa, not WABO.  *See* D.E. 114-10 at 4.  Nothing in the record purports to threaten *WABO* with litigation.  To the contrary, the letter specifically states that Calixto "is entitled to damages as a result of the breach of the Agreement" and that Calixto has authorized counsel "to pursue all rights and remedies available to [Calixto] under the Agreement and in accordance with applicable law."  *Id.* at 3.  WABO is not a party to the agreement and, as the Florida Circuit Court suggested, does not appear to be a proper party to a breach-of-contract action.  Moreover, because CRT is a German company and Calixto is a Brazilian national, it was not unreasonable for Degussa counsel at the time of receipt of the September 9, 2004, letter to view the letter as threatening legal action outside the United States.  In short, the Court does not find that the September 9, 2004, letter triggered a duty on the part of WABO to preserve Burri's e-mails.

Even if it had, however, after hearing testimony from Young, the Court concludes that Young did not delete Burri's e-mail mailbox in an effort to destroy evidence relevant to this matter.  Young credibly testified that, as a senior information systems analyst, her primary job was to ensure the security and proper functioning of WABO's computer system, something that too much information

-30-

storage threatened.  Consequently, she explained, since 1997 or 1998 when WABO acquired the computer system it uses now, she had engaged in the practice of deleting the e-mail mailboxes of departed WABO employees.  Young further attested credibly that it was her idea to delete the mailbox and that no one had suggested that she do it.  Finally, she stated that she had no knowledge of either Calixto or the matters at issue in this lawsuit at the time that she deleted Burri's e-mail mailbox. Calixto presented no evidence to the contrary.  Under these circumstances, the Court cannot find bad faith on the part of WABO.  Consequently, spoliation sanctions are not appropriate.

## B.  Plaintiff's Motion for Letters of Request

Pursuant to the Hague Convention, Plaintiff seeks for the Court to issue letters of request to Germany, China, and Hong Kong SAR, for discovery regarding BASF SE Construction Chemicals Division, BASF Construction Chemicals Asia Pacific, and Sanfield Industries Ltd., respectively. Because Thailand is not a signatory to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, opened for signature, Mar. 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444 ("Hague Convention"), Plaintiff also requests that the Court issue a letter rogatory to Thailand to enable Plaintiff to achieve subpoena service on Vispack Co., Ltd.

The Court begins its analysis with a brief review of the Hague Convention.  Along with the United States, in excess of forty other countries and territories, including Germany, China, and Hong Kong SAR, have acceded to the Hague Convention.  *See* http://travel.state.gov/law/info/judicial/ judicial_689.html (United States Department of State Bureau of Consular Affairs's website).  This agreement sets forth procedures by which a judicial authority in a signatory country or territory may request evidence located in another.  *Société Nationale Industrielle Aérospatiale v. United States District Court for the Southern District of Iowa*, 482 U.S. 552, 524 (1987) ("*SNIA*").  The preamble

of the Hague Convention memorializes the agreement's purpose as being "'to facilitate the transmission and execution of Letters of Request' and to 'improve mutual judicial cooperation in civil or commercial matters.'" *Id.* at 534 (quoting 23 U.S.T., at 2557, T.I.A.S. No. 7444). Although the Supreme Court has concluded that the signatories to the Hague Convention intend it as a "permissive supplement, not a pre-emptive replacement, for other means of obtaining evidence located abroad," *id.* at 536, in this instance, where Plaintiff seeks evidence from entities who are neither parties to the pending case nor otherwise subject to the Court's jurisdiction, Plaintiff may not employ the Federal Rules of Civil Procedure. Thus, to the extent that the Court deems Plaintiff's subpoena requests to be appropriate, the Hague Convention sets forth the applicable manner of proceeding.

        In determining whether to issue letters of request pursuant to the Hague Convention, a court should determine both whether the discovery sought falls within the scope of discovery authorized by the Federal Rules of Civil Procedure, as well as whether considerations of comity warrant the requested discovery. *See, generally, SNIA*, and *see id.* at 543-44 and 544 n.28. Turning first to the applicable standard under the Federal Rules of Civil Procedure, the Court notes that Rule 26(b), Fed. R. Civ. P., governs the scope of permissible discovery in federal actions. Under that rule, "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ," as long as the requested information "appears reasonably calculated to lead to the discovery of admissible evidence. Fed. R. Civ. P. 26(b). The Advisory Committee Notes to Rule 26 indicate that "[t]he purpose of discovery is to allow a **broad** search for facts, the names of witnesses, or any other matters which may aid a party in the preparation or presentation of his case." Adv. Com. Notes, 1946 Amendment, R. 26, Fed. R. Civ. P. (citations omitted) (emphasis added).

Indeed, the Advisory Committee Notes approvingly cite language from a case stating that "the Rules . . . permit 'fishing for evidence as they should.'" *Id.* (citation omitted); *see also Hickman v. Taylor*, 329 U.S. 495, 507 (1947) ("No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case.").

The courts have long recognized the wide scope of discovery allowed under the Federal Rules of Civil Procedure.  As the Eleventh Circuit's predecessor court noted,

> The discovery provisions of the Federal Rules of Civil Procedure allow the parties to develop fully and crystalize concise factual issues for trial. Properly used, they prevent prejudicial surprises and conserve precious judicial energies.  The United States Supreme Court has said that they are to be broadly and liberally construed.

*Burns v. Thiokol Chem. Corp.*, 483 F.2d 300, 304 (5th Cir. 1973)[8] (citing *Hickman v. Taylor*, 329 U.S. 495, 507 (1947); *Schlagenhauf v. Holder*, 379 U.S. 104, 114-115 (1964)).

Of course, the scope of permissible discovery is not unbounded.  Requested discovery must be relevant, it must not be protected by privilege, and it must not impose undue burden or be unnecessarily cumulative under the tests described in Rule 26(b)(2)(C):

> On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rules if it determines that:
>
> (i)     the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii)    the party seeking discovery has had ample opportunity to

---

[8]  Pursuant to *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit.

obtain the information by discovery in the action; or

(iii)    the burden or expense of the proposed discovery outweighs its
likely benefit, considering the needs of the case, the amount
in controversy, the parties' resources, the importance of the
issues at stake in the action, and the importance of the
discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C).

Plaintiff argues that the evidence sought through the letters of request falls well within the

bounds of allowable discovery.  In this regard, Plaintiff argues that Burri testified in such a way

during his deposition as to make it "apparent that foreign third parties BASF SE, BASF Construction

Chemicals Asia Pacific, Sanfield Industries Limited, and Vispack Co., Ltd., which are affiliates

and/or distributors of WABO (collectively, the 'Asia/Pacific Affiliates'), may have documents

regarding the sale and shipment of 'ALADIN' products in the Asia/Pacific Territory."  D.E. 89 at

2.  According to Plaintiff, the documentation it has sought will reflect the sales and shipments of

"ALADIN" products by the Asia/Pacific Affiliates, which, in turn, will provide evidence of damages

resulting from WABO's alleged tortious interference.  *Id.*  In explaining why he cannot obtain the

evidence sought through other sources, Plaintiff asserts that he tried to procure the documentation

at issue through requests to WABO, but WABO responded that it lacked control over the

Asia/Pacific Affiliates.  *Id.*  Moreover, Plaintiff contends, "WABO has purged its electronic data,

refusing to restore and search the only electronic data left, back-up tapes."  *Id.*

For its part, WABO argues first that the discovery sought bears "little or no relationship to

this lawsuit."  D.E. 95 at 2.  Additionally, WABO takes issue with Plaintiff's contention that WABO

"purged its electronic data, refusing to restore and search the only electronic data left, back-up

tapes." *Id.* at 5.  To the contrary, WABO explains that "it has never purged its electronic data and . . . e-mails are subject to a legal hold." *Id.*  Moreover, according to WABO, it has already produced the information that Plaintiff seeks through the letters of request.  *Id.*  Thus, even if the information sought is relevant, WABO urges, the Court should still disallow discovery because the proposed letters of request seek evidence that is cumulative and duplicative.

The Court finds that the information Plaintiff seeks through the letters of request falls within the broad scope of discovery anticipated by the Federal Rules of Civil Procedure.  The Complaint in this matter alleges that WABO tortiously interfered with Plaintiff's contractual relationship with CRT under the Agreement by causing CRT's breach and disregard of the Agreement Not to Compete and the right of consent of assignment.  As this Court has previously construed the tortious interference claims, "Plaintiff's claim against WABO is premised on the fact that it continues to use the [JEENE] [T]rademark and [P]atent in the Asia/Pacific Territory in contravention of the Agreement." D.E. 59 at 3.  Plaintiff has also alleged that WABO engages in this conduct, at least in part, through sales of its ALADIN product.  *See* D.E. 1 at 23; D.E. 89 at 2.  Consequently, evidence tending to show that it is either more or less likely that WABO, in fact, continued to use the JEENE Trademark and Patent, whether or not through sales of ALADIN, meets the definition of relevancy and, accordingly, falls within the permissible scope of discovery under Rule 26. Similarly, evidence shedding light on any sales of JEENE and ALADIN by WABO to or through these affiliates reflects on the damages claim Plaintiff has pled.

As noted above, Plaintiff's letters of request seek to obtain documents from WABO's foreign affiliates relating to the Patent, the JEENE Trademark, and the ALADIN product and are directed primarily at documents regarding manufacturing, sales, orders, marketing, pricing, and profitability

of JEENE and ALADIN products.  *See* D.E. 89-3, D.E. 89-5, D.E. 89-7, D.E. 89-9.  As the Court has previously interpreted Plaintiff's claim, these items should provide information regarding whether WABO, in fact, continued to use the JEENE Trademark and Patent, whether or not through sales of ALADIN, and, if so, should quantify any such sales, seek relevant matter, to the extent that they request such documents referring to any manufacturing, sales, orders, marketing, pricing, and profitability of JEENE and ALADIN products with which WABO has a connection.

Thus, the Court must consider whether any of the Rule 26(b)(2)(C), Fed. R. Civ. P., limitations preclude the requested discovery.  Specifically, WABO urges that the letters of request seek unnecessarily duplicative information.  In this regard, WABO argues that in responding to discovery in this case, it has already produced all documents that would indicate WABO's involvement with JEENE and ALADIN products, as well as the Patent and JEENE Trademark.  *See* D.E. 95 at 5-6.  Thus, the logical import of WABO's argument suggests that even if the foreign affiliates had documents responsive to the subpoenas, such documents would be cumulative and duplicative of what WABO has already provided to Calixto.  WABO rejects Calixto's allegations that it has purged or otherwise tampered with the universe of responsive documents that it should have had at some point.

For the reasons already discussed in the analysis of Plaintiff's Motion to Compel, the Court finds that at this time no evidence indicates that WABO has improperly deleted or otherwise failed to provide to Plaintiff responsive documents.  Hence, the Court turns to WABO's contention that the subpoenas on the foreign affiliates would serve merely to acquire duplicative and cumulative evidence.  In this regard, the Court concludes that WABO's reasoning makes sense, and it does seem likely that the subpoenas would yield mostly, if not all, duplicative information.

Moreover, taking into account the comity considerations that attach to Hague Convention discovery requests as identified by the Supreme Court in *SNIA*, the Court further conclude that denying Plaintiff's Motion for Letters of Request is appropriate in this case.  As the Supreme Court noted,

> [T]hese factors are relevant to any comity analysis:
>
> "(1)   the importance to the . . . litigation of the documents or other information requested;
>
> "(2)   the degree of specificity of the request;
>
> "(3)   whether the information originated in the United States;
>
> "(4)   the availability of alternative means of securing the information; and
>
> "(5)   the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." . . .

*Id.*, 482 U.S. at 544 n.28 (citation omitted).

With respect to the first factor, in view of the other discovery in this case, as well as the admissions of Burri and Patterson regarding sales of JEENE-type products in the Asia/Pacific Territory, any potential importance of the documents sought by Calixto diminishes.  As to the second factor, the requests, for the most part, are relatively specific, thus, weighing in Calixto's favor.  Third, it seems unlikely that any information recovered as a result of the letters of request or letter

rogatory sought would have originated in the United States. To the contrary, it appears more likely that it would have originated in each of the respective foreign countries, weighing in favor of Defendant.

With regard to the fourth factor, the Court has already discussed at length the likelihood that the documents sought will duplicate most, if not all, of the information already provided by WABO in this matter. Nevertheless, the Court finds it significant that a comity consideration takes into account the availability of the evidence sought from alternate sources. While the United States should certainly not hesitate to take advantage of the Hague Convention process in appropriate cases, the fact that a court must consider the availability of other methods of obtaining the information sought before resorting to the Hague Convention procedures indicates that discovery pursuant to the Hague Convention procedures should not commence simply because relevant evidence may exist in a signatory country. Instead, a court must give serious consideration to the availability of alternate sources, as a Hague Convention request does impose some burden on a foreign country. In view of this fact, here, where the evidence sought is likely to be duplicative of information that Calixto has already been able to obtain through the ordinary course of discovery, this comity consideration weighs against Calixto and in favor of Defendant. Finally, the Court is not aware of a sovereign nation's interest in this case that might militate either in favor of or against issuance of the letters of request or letter rogatory. Thus, consideration of the comity factors reinforces the Court's conclusion that Plaintiff's Motion should be denied.

### *Conclusion*

For the foregoing reasons, the Court **GRANTS IN PART and DENIES IN PART** Plaintiff

Jorge G. Z. Calixto's Motion to Compel Defendant Watson Bowman Acme Corp. To Remedy Its Spoliation of Documents [D.E. 86]. Defendant WABO shall restore and search the December, 2004, back-up tape for the Burri e-mails and all records that otherwise must be produced in this litigation pursuant to Defendant's responsibilities under the Federal Rules of Civil Procedure and under the subpoena *duces tecum* served on WABO. The Court **DENIES** Plaintiff Jorge G. Z. Calixto's Motion for Issuance of Letters of Request [D.E. 89] ("Motion for Letters of Request")

   **DONE AND ORDERED** this 16th day of November, 2009.


                                                    _____
                                                    ROBIN S. ROSENBAUM
                                                    UNITED STATES MAGISTRATE JUDGE


cc:     Hon. William J. Zloch
        Counsel of Record